Filed 12/6/24  P. v. Prado CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>ALEJANDRO PRADO,<br><br>    Defendant and Appellant. | F087068<br><br>(Super. Ct. No. VCF041328B-98)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Tulare County.  Melinda Myrle Reed, Judge.

John Steinberg, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Kimberley A. Donohue, Assistant Attorney General, Darren K. Indermill and Warda Ali-Baloch, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

**INTRODUCTION**

Petitioner Alejandro Prado petitioned the superior court, pursuant to section 1172.6 of the Penal Code,[1] for resentencing on one count of first degree murder and four counts of premeditated attempted murder. The trial court conducted an evidentiary hearing and denied the petition after finding petitioner harbored a specific intent to kill each of the victims.

Petitioner contends the court erred in denying the petition as to the attempted murder counts because substantial evidence does not support a finding that he committed multiple counts of attempted murder. In this regard, he contends substantial evidence suggests he fired only a single shot into a vehicle occupied by multiple persons, which cannot support multiple convictions for attempted murder. He further contends the court erred in relying on inadmissible hearsay to prove his intent to kill and erred in relying on a kill zone theory of liability.[2]

We reject petitioner's contentions and affirm.

**FACTUAL BACKGROUND[3]**

This case involves a shooting incident between two vehicles traveling northbound on Highway 65 between Porterville and Lindsay at approximately 12:45 a.m. on November 23, 1997. In the victim's vehicle, the driver, Joseph A.,[4] was uninjured. His right front passenger, Celeste M., sustained minor burn-type injuries. Rear passengers

---

[1] Undesignated statutory references are to the Penal Code.

[2] Petitioner does not challenge the court's denial of the petition as to the murder count.

[3] Petitioner filed a request for judicial notice of "[t]he reporter's transcripts and clerk's transcripts of [his] jury trial in Tulare County Superior Court No. VCF041328B-98." We construe this as a request for judicial notice of the record on appeal in petitioner's direct appeal, *People v. Chavez*, F034110, and grant the unopposed request.

[4] Pursuant to California Rules of Court, rule 8.90, we refer to some persons by their first names or initials. No disrespect is intended.

Shalisa H. and Ray P. sustained gunshot wounds but survived. Rear passenger Marlene Romero was fatally shot in the head.[5]

The suspect vehicle was driven by petitioner's codefendant, Marcos Chavez. Petitioner was the right front passenger and codefendant Jamie Guzman was in the right rear passenger seat.[6] Two firearms were used in the shooting.

We summarize additional details surrounding the shooting below.

## I. Events Preceding the Shooting

### A. The Victims Travel to Porterville

On the evening of November 22, 1997, Joseph drove his father's black, four-door, Dodge Neon from Strathmore to Lindsay and eventually to Porterville, picking up his friends, Ray, Celeste, and Shalisa on the way. In Porterville, the group went "cruising" up and down Olive Street, with Joseph driving, Celeste in the right front passenger seat, Ray in the right rear passenger seat, and Shalisa in the left rear passenger seat.

### B. Gathering at Petitioner's House

Around the same time, a group of friends began gathering at petitioner's house. Petitioner's cousin, "Big Alex,"[7] heard petitioner was having a party so he drove to petitioner's house in his mother's black, two-door Honda Accord. Quite a few people were there but they had no beer. Accordingly, Big Alex drove to a store in Plainview that he knew would sell him beer. Guzman went with him and, on the way, they picked up

---

[5] At the time, Joseph and Ray were 17 years old. Shalisa was 16 years old, and Marlene and Celeste were 15 years old.

[6] At the time, petitioner was 18 years old, Chavez was 17 years old, and Guzman was 16 years old.

[7] Petitioner and his cousin share the same name. To avoid confusion, we refer to his cousin by the nickname "Big Alex," which was used to refer to him throughout the trial.

Big Alex was granted use immunity for his testimony in the People's case-in-chief.

Chavez and A.E. They picked up a case of beer in Plainview and returned to petitioner's house.

While they were gone, at approximately 8:45 p.m., law enforcement responded to petitioner's house for a call of shots fired. At the residence, officers contacted petitioner and two other youth. Petitioner consented to a search of the backyard, where officers located a .38-caliber expended shell casing that appeared "extremely fresh." Officers searched the residence but no weapons were found. The shell casing was seized as evidence. Officers suggested that the other youth at the residence leave to comply with their probation curfews; one of the youth left on foot while the other, a juvenile, was driven home by law enforcement.

When Big Alex and his companions returned to petitioner's house, they saw police officers. They drove around the block and, by the time they returned, the officers were gone.

Later that evening, petitioner's sister, E.P., drove Chavez and Guzman to a fast-food restaurant to buy something to eat, then drove Chavez to his mother's place of employment to pick up his mother's silver, four-door Honda Civic. Thereafter, Chavez returned to petitioner's house in the Civic.

Around 11:45 p.m., a group comprised of at least Chavez, A.E., and Big Alex went out cruising in the Civic to look for girls.

C.     **Encounter on Olive Street**

The occupants of Chavez's car encountered the occupants of Joseph's car while cruising on Olive Street. Words were exchanged before both cars entered the parking lot of a car wash where other young people from Lindsay were gathered. Chavez then quickly drove away. The details of this encounter from the People's case-in-chief are discussed below.

Joseph testified that a beige Civic with five occupants pulled up to the driver's side of his vehicle. Joseph did not know any of the occupants of the other vehicle but

4.

identified Chavez at trial as the driver. Shalisa and Celeste both said, "There's Alex Prado." Shalisa began talking with someone in the backseat of the Civic and said he was her boyfriend or ex-boyfriend. Joseph denied saying anything to anyone in the other vehicle or "mad dogging" them, i.e., giving them dirty looks. Someone in the Civic told Joseph to pull over. Joseph eventually saw his friends at the car wash and pulled into the parking lot. The Civic pulled in behind him but did not stop before pulling out again.

Celeste testified that she saw Big Alex in the right rear passenger seat of a beige, metallic, four-door car. She knew Big Alex as someone her cousin Shalisa was "seeing" or "going out with." She also thought the person in the right front passenger seat was A.E., but she identified Chavez at trial as the right front passenger. Petitioner was not in the car.[8] Big Alex argued with Shalisa about going out with the guys in Joseph's car and asked what she was doing there. The person in the right front passenger seat said something about "Porro," which Celeste understood to refer to Porterville, and he said "[F]uck you bitches." Big Alex and the front seat passenger appeared angry and there was a heated discussion between them and Shalisa. Shalisa told them to pull into the car wash so she and Big Alex could talk.[9] Joseph pulled into the car wash and parked. "[A] bunch of friends" were gathered there. Shalisa got out of the car to talk to Big Alex but the other car quickly left.

Ray testified that he saw a light brown or gray four-door car containing four or five people who "started saying something." Shalisa began arguing with one of the guys

<hr>

[8] Celeste knew petitioner as an acquaintance who she was "seeing" or "messing around" with and had kissed, but they were not "boyfriend and girlfriend."

[9] Multiple witnesses were questioned as to whether Shalisa may have made any type of hand gestures during this exchange. This elicited testimony that Shalisa may have "flipp[ed] off" the occupants of the other car and/or made an "L," for Lindsay, with her thumb and index finger while curling in her remaining fingers, in a gesture that also could be construed as mimicking a firearm. Shalisa testified that she only "flipp[ed] off" Big Alex and pointed with her index finger for the other car to pull over.

in the other car. Ray thought they were playing around because it did not look serious. However, Shalisa flipped off one of the guys in the other car and the other car followed them into the car wash parking lot. The occupants of Joseph's car got out and walked away, except for Shalisa who stood there. The occupants of the other car said something then left.

Shalisa testified that Big Alex was in a four-door car with three other people she did not know. Big Alex gave her a "funny" or "dirty" look. He was laughing and his friends were cussing and calling the occupants of Joseph's car names. Shalisa and her companions did not respond. Shalisa got upset and flipped them off. She told Big Alex to pull over. The other car followed them into the parking lot and Shalisa got out. Big Alex stuck his head out the window but the car left before Shalisa could speak with him.

Big Alex testified in the prosecution's case-in-chief that four people were in the car: himself, A.E., Chavez, and another person Big Alex did not know. Big Alex and A.E. were in the backseat while Chavez and the fourth person were in the front seats of the car. A car came up behind them with Shalisa in it. Big Alex denied that Shalisa was his girlfriend and characterized her as a girl he "got together" with once, who was just one of many girls he met every week. The driver of the other car got upset and Big Alex saw someone's hand go up, which could have been a gang sign or a "gesture like hi." He denied that Shalisa flipped him off. There was "something going on" between Chavez and the driver of the other car, which Chavez was unhappy about. The driver of the other car said to follow them, so Big Alex's group followed them to the car wash. However, there were a lot of guys at the car wash and Big Alex's group was afraid they might get beat up so they left. The crowd at the car wash did not approach Chavez's car or do anything to intimidate them.

### D.    Conduct After the Car Wash Encounter

Thereafter, Chavez's group returned to petitioner's house. Chavez was "maybe upset" about his encounter with Joseph.

Meanwhile, at the car wash, Joseph's group encountered Joseph's schoolmate, Marlene, who asked him to take her to a restroom. Joseph drove Marlene and his other companions to a fast-food restaurant about a block away, then back to the car wash. Marlene later asked to use the restroom again and the group drove to a nearby mini-mart. When they returned to the car wash, they could not find Marlene's brother to give her a ride home. Joseph offered to give Marlene a ride home to the Strathmore area.

At some point, Big Alex left petitioner's house in his own car with A.E. While out on Olive, he saw the Neon pass by him. He also saw Chavez's car, with Chavez driving and petitioner and Guzman as passengers.

Joseph and his group drove to a donut shop to use a pay phone. While there, Joseph saw the Civic pass by on Olive with three people in the car. Joseph's group made a final attempt to find Marlene's brother on Olive and, when they were unsuccessful, proceeded toward the highway. Celeste was in the right front passenger seat, Shalisa was in the left rear passenger seat, Marlene was in the middle rear passenger seat, and Ray was in the right rear passenger seat. As Joseph entered the highway, he saw both the Civic and the dark-colored car on Olive, but they did not immediately follow him onto the highway.

Big Alex testified that he was proceeding in the opposite direction from the highway entrance on Olive when he saw Chavez's car near the highway on-ramp. Chavez motioned for Big Alex to follow him. Big Alex made a U-turn then proceeded to follow Chavez up the ramp at a distance.

II.     The Shooting

Once on Highway 65, Joseph traveled in the right-hand lane at a speed of 55 or 60 miles per hour. At approximately 12:45 a.m., as he approached the Linda Vista exit, the Civic rapidly pulled up next to him in the left-hand lane, while the darker car driven by Big Alex pulled up behind him in the right-hand lane. Joseph saw three people in the Civic: a driver, a right front passenger, and a right rear passenger. In the moment and at

7.

trial, Celeste identified petitioner as the front passenger. She identified Guzman as the right rear passenger. Petitioner and Guzman were staring at the occupants of Joseph's car. Ray testified that the occupants were yelling something at Shalisa.

According to Joseph, the Civic dropped back next to the black car, approximately one car length behind the Neon, and the occupants started shooting. Joseph saw flashes from guns coming from the front and rear passenger areas of the Civic. Joseph heard more than 10 shots. He accelerated away and the shooting stopped. The other two cars turned off the highway.

According to Celeste, the shooting began when the Civic was alongside the Neon. After the shooting started, the Civic slowed down and pulled back. Celeste saw one or two sparks coming from the area of the door frame between the front and rear passenger windows before she ducked and turned away.[10] Celeste heard pops but could not recall how many. She could not tell which person was shooting. However, she believed it was petitioner because the front seat passenger in the Civic was aligned with the rear passengers in the Neon when Shalisa was shot.

According to Ray, Joseph sped up and the Civic dropped "quite a bit aways behind" Joseph's car before he heard loud noises and felt something hitting the car. Ray looked back and could see "two flashes coming from the car. It was like one from the passenger and one from the back passenger." He could see a gun coming from the front passenger seat area and saw flashes coming straight from that gun toward Joseph's car. He also saw flashes from the rear passenger seat going up in the air. He could not recall how many flashes he saw. He heard more than five shots. He ducked after seeing the first flash.

---

[10] When asked how many sparks she saw, Celeste testified: "Just one. It looked like two. It looked – you could tell there was two, because for some reason it was so big between the middle that it just looked like one big, big spark." After that she turned and put her head down.

Shalisa testified that she looked toward the other vehicle as Celeste said, "That's Alex," and she then heard gunshots. She heard two shots, after which her ear popped and she only heard squeaking sounds. At trial, Shalisa could not identify anyone in the vehicle that shot at them. However, she acknowledged having previously identified petitioner in a photographic lineup and having told a detective that he was in the front passenger seat of the vehicle.

Big Alex testified that he was a football field away when he saw Chavez's car pull alongside another car. He saw flashes coming from the passenger side of Chavez's car before Chavez's car sped away and the other car almost wrecked into a fence. Big Alex followed the other car to Strathmore before turning off and returning to petitioner's house.

A witness who lived near the location of the shooting testified that he was awakened at approximately 12:45 a.m. by multiple gunshots. He described hearing "at least half a dozen or more" shots fired in rapid succession.

## III. Conduct After the Shooting

Joseph drove directly to the hospital in Lindsay. Ray was shot in the back. Shalisa was shot in her upper back and was in and out of consciousness during the drive. Marlene was not responsive, was gasping for air, and eventually seemed to stop breathing. Medical personnel assisted her into the hospital, where she later died from bleeding as a result of a single gunshot wound to the head that entered near her left eyebrow and exited in her right neck area.

When Big Alex returned to petitioner's house, Chavez's car was parked on the curb. Petitioner was behaving normally, Guzman was relaxed, and Chavez was scared. Chavez told him they shot up into the air. Someone moved Chavez's car inside the gate and people were going in and out of the house. After about an hour, police arrived. Big Alex denied seeing any guns or taking any items out of Chavez's car.

9.

## IV.     Investigation

At the hospital, law enforcement examined the Neon and observed it appeared to have one bullet hole in the trunk area above the keyhole, one in the left taillight area going into the trunk area, one in the left rear wheel well, and one in the left rear quarter panel.  The left rear tire was flat and there was an indentation on the rim where it appeared to have been struck by a bullet.  There was a large amount of blood and a spent projectile visible in the rear seat area.  The following day, officers returned to the hospital and located an expended .38-caliber Super Auto-type bullet on the ground near the emergency room, in the area where the Neon initially had parked.

Ultimately, officers recovered an expended .38-caliber Super Auto bullet from the right rear seat, an expended nine-millimeter Luger-type bullet from the left rear seat, and an expended .38-caliber Super Auto bullet from the left rear door.  Criminalist S. O'Clair determined that one .38-caliber Super Auto bullet entered to the rear of the left rear door, passed through the fender and door jamb, and entered the left rear door, where it was recovered.  Another .38-caliber Super Auto bullet entered near the center of the trunk, passed through the trunk and into the passenger compartment, where it hit Ray and ultimately was recovered from the right rear seat.  Another .38-caliber Super Auto bullet entered through the left rear taillight, and passed through the trunk and into the passenger compartment, where it struck Marlene while she was ducking down.  O'Clair opined that this was the bullet recovered at the hospital parking lot and that it fell from Marlene's person as she was moved from the car.  Additionally, a nine-millimeter bullet entered above the tire and passed through the wheel well before entering the passenger compartment and striking Shalisa while she was ducked down.  O'Clair identified this as the bullet recovered from the left rear seat.  Lastly, a bullet struck the left rear tire.  O'Clair could not determine whether the bullet that struck the tire was a nine-millimeter or .38-caliber Super Auto.  The bullets that hit Marlene and Ray were fired from the same gun.

10.

Deputies were dispatched to shut down the highway where the shooting occurred at approximately 1:18 a.m. There, deputies located seven Winchester brand .38-caliber Super Automatic +P shell casings and one spent lead core from a bullet.[11] Law enforcement subsequently determined that all the .38-casings were fired from the same weapon, and this was also the weapon that fired the .38-casing retrieved from petitioner's backyard the night before. No nine-millimeter shell casings were located at the scene.

Based on information received from the victims at the hospital, law enforcement was advised to be on the lookout for petitioner and the suspect Civic. Approximately 30 to 45 minutes after the alert was issued, petitioner was detained at his residence. Also present at the residence were Big Alex, A.E., Guzman, and Chavez.

In the driveway of the residence, officers located a black, two-door Honda Accord belonging to Big Alex's parents. Behind a fence and locked gate, officers located Chavez's mother's Civic, which was partially covered with a blanket-type material. Both vehicles were warm to the touch. In the front seat of the Civic, officers located a beanie and a small cloth or towel. When these items were moved, a nine-millimeter spent Luger shell casing fell back onto the seat. No other shell casings were located in the Civic and no shell casings were located in the Accord.

No weapons were found in Guzman's or Chavez's homes. A nine-millimeter semiautomatic pistol was found in petitioner's attic. At Big Alex's home, law enforcement located twelve .38-caliber Super +P shell casings, a .380-caliber semiautomatic live round, a 12-gauge shotgun shell, and a nine-millimeter firearm. O'Clair determined that the cartridge casings found at Big Alex's house were not fired from the firearm used in the shooting at issue in this case. O'Clair determined that one of the nine-millimeter firearms recovered from the suspects' residences did not fire the shell

---

[11] Law enforcement could not determine whether this lead core came from a .38-caliber Super Auto bullet or a nine-millimeter Luger bullet.

casing found in the suspect vehicle or the nine-millimeter bullet found in the victim's vehicle. The other nine-millimeter firearm did not fire the casing found in the Civic, but O'Clair could not positively eliminate this firearm as the one that fired the bullet found in the victim's car. However, he opined that it "probably didn't fire [this] bullet."[12]

Samples taken from inside the right front door of the Civic contained particles consistent with gunshot residue. Samples taken from the exterior of the right rear passenger door, as well as the interior and exterior of the right rear passenger window, also contained particles consistent with gunshot residue. Samples collected from petitioner's hands contained particles consistent with gunshot residue, indicating petitioner had either discharged a firearm or been in the environment of gunshot residue. Samples collected from Chavez, Guzman, and Big Alex contained no particles consistent with gunshot residue.

A fingerprint taken from the outside surface of the right rear door of the Civic, above the door handle, matched petitioner. A palm print taken from the trunk lid did not match any of the suspects. No other usable prints were obtained from the Civic.

Toxicology testing of petitioner, Chavez, A.E., and Big Alex was negative for drugs and alcohol. Guzman's toxicology tests were negative for alcohol but yielded methamphetamine in the amount of 92 nanograms per milliliter, a "fairly high amount of methamphetamine."

## V.    Statements Regarding the Shooting

Petitioner was interviewed by law enforcement on the morning of November 23, 1997, and reported he was home all night.

The same morning, Guzman reported to law enforcement that, at the time of the incident, he had been at petitioner's house for two days. He reported he was in Plainview

---

[12] The testimony is contradictory as to which firearm was found in petitioner's house and which was found in Big Alex's house.

getting beer with Big Alex and A.E. when police came to the house the day before. He returned to the house after the police left, then went out again to cruise and to get food before returning again to petitioner's house. Back at the house, Guzman did methamphetamine and did not leave again until police arrived. He denied anyone had a gun.

In a separate interview conducted the following day, Guzman admitted that he went cruising with Chavez on the night of the shooting and one gun was in the car. Neither Chavez nor Guzman fired the gun, but he did not know whether anyone else did so.

Chavez also was interviewed on the morning of November 23, 1997. Chavez reported that he went with the group to Plainview to buy beer, then returned to petitioner's house. He then went with E.P. to buy food before picking up his mother's car. He returned to petitioner's house at approximately 11:15 p.m. and pulled behind the gate because he planned to stay the night. They drank a couple of beers and Chavez and Big Alex fell asleep. They later were awakened by law enforcement. In this interview, Chavez denied going cruising or seeing any guns.

In subsequent interviews, Chavez reported he was cruising with A.E. and Big Alex when he got into a confrontation with the occupants of the Neon and followed them to the car wash to fight. However, he and his companions were outnumbered and Chavez said, "[W]e can't do it right now because look how many guys there is." Accordingly, they left and returned to petitioner's house. Chavez reported that they "were all talking" about the black Neon and they discussed finding the Neon and fighting its occupants later on.

Eventually, they left again to look for the guys in the Neon. Chavez drove petitioner and Guzman, and Big Alex drove A.E. Chavez did not see anyone put guns in the car. Chavez saw the Neon turn onto the freeway and followed them. Chavez saw Big Alex in the other car and waved to him, and he then also entered the freeway. Petitioner told Chavez to get on the side of the Neon. One of the occupants of the other car told

13.

petitioner to follow them to Lindsay. Chavez did not want to go to Lindsay and started slowing down to make a turn. Petitioner exchanged words with the driver and the girl in the back seat of the Neon.

Chavez then heard a loud gunshot and saw petitioner bringing his arm into the car after firing in the air. Petitioner fired a single shot. Chavez saw the gun in petitioner's lap and said, " 'What the hell are you doing, homes?' " Then, as Chavez was turning, Guzman shot approximately five shots. Chavez denied that the shooting was planned.

Chavez returned to petitioner's house, where petitioner and Guzman got out to open the gate before going inside. Chavez pulled behind the gate. Inside the house, Chavez asked petitioner whether they lost any shell casings in the car. Guzman stated that he thought he saw four casings go into the car but was not sure. Chavez searched the car but did not find anything. Chavez did not know what they did with the guns.

A few days after the incident, petitioner called Celeste and initially identified himself as someone else. After subsequently identifying himself as petitioner, he said, "You didn't see me in there." Celeste said, "Yeah, I did see you. I looked straight at you." Petitioner responded, "Well, I didn't see you."

M.S. testified that she worked at a restaurant in Porterville with E.P. E.P. told M.S. that her brother had been arrested for murder and that she had cleaned up the house after it had been searched by police. E.P. reported that, while doing so, she found a gun in her parents' sock drawer and that one bullet had been shot from it. E.P. asked M.S. what she should do and M.S. told her to turn it in. E.P. expressed that she thought she would be prosecuted if she turned it in and she stated that she wanted to get rid of it and throw it in the river. M.S. reported this information to law enforcement. Law enforcement searched E.P.'s residence but no firearm was found.

D.T. testified that in December 1997 or January 1998 he was in custody in a juvenile facility where he was housed with Guzman. Guzman told D.T. that they did not

mean to shoot to the girl and that "they meant to shoot some guys and the girl was in the cross fire, something like that. She was just in the way."

B.M. testified that he was in juvenile custody in 1997 and Chavez was his cell mate. B.M. recalled talking with Chavez about the shooting but could not recall what was said. He spoke with law enforcement regarding this communication but could not recall what was discussed. An investigator testified that B.M. reported Chavez admitted he was the driver, did not know there were guns in the car, and thought they were going to fight the guys in the other car. B.M. also reported that he spoke with Guzman, who acknowledged being the shooter.

## VI. Defense Case

Chavez testified in the defense case.

Chavez testified that he was picked up that night by Big Alex, Guzman, and A.E. They went to Plainview to buy beer then went to petitioner's house. Police were there, so the group drove around the block. When they eventually went back to the house, Chavez asked petitioner about the police and petitioner reported that someone shot a gun in the backyard, but police searched the house and did not find anything. Around 10:30 p.m. petitioner's sister arrived, and she took Chavez to a fast-food restaurant and then to his mother's work to pick up her car. Chavez returned to petitioner's house, where they ate, and E.P. left.

Later, Chavez, A.E., and Big Alex went cruising and ran into the Neon on Olive. Big Alex said that the girl in the back seat was his ex-girlfriend. She told Big Alex, "Quit looking at me, why you looking at me," and flipped them off. Chavez was laughing. The guy driving the Neon got "kind of mad" and asked Chavez what he was looking at and if he had a problem. The other driver told Chavez to pull over, Chavez told him to pull over, and the driver then told Chavez to go to the car wash. Chavez followed the Neon to the car wash and pulled over. The guy driving the Neon talked to people near another car, and those people started walking toward Chavez's car. Chavez acknowledged that he

15.

later told law enforcement, "It was like a bunch of guys and I told them, you know, we can't do it right now, because look how many guys there is." Chavez drove away and went back to petitioner's house.

At trial, Chavez initially denied that he spoke with anyone at the house about the Neon or what happened at the car wash. However, he acknowledged that he "probably" told detectives that, they "went back to [petitioner's] and that's when everybody had brought it up." He also "[p]robably" reported to detectives that, after standing around the house for 20 minutes, "[they] were all talking, you know what I mean? You know, you know we talked and we said, 'Oh it's that black Neon. You know what I mean?" He also acknowledged that he said, "Yeah, you know, later on we'll catch up with that car, you know, and find out who the guy . . . was, you know. Fight 'em, you know, later on." At trial, he testified that this statement was made only to Big Alex. He denied discussing the encounter with the Neon with petitioner and Guzman, and denied having made a plan to find the Neon and shoot at it. However, he acknowledged that, when a detective subsequently asked, "You guys planned it. You guys just said, 'Well, let's go to Olive and look for that car,' right?" Chavez responded, "Yeah, you know, if we find them, we're . . . gonna kick their ass or something." However, Chavez testified that this was only what he was thinking in his head.

Chavez testified that he later asked Guzman and petitioner if they wanted to go for a cruise down Olive. The Neon came up beside them, and the driver said, "What? What are you looking at?" and told Chavez to follow him. The Neon got onto Highway 65 and Chavez followed behind. Big Alex also followed. Chavez got beside the Neon. The driver waved for Chavez to keep following. Chavez did not want to follow them to Lindsay so he started to slow down. As he did, someone in the back seat of the Neon rolled down their window and stuck their hand out and Chavez saw what he believed to be a black gun, similar in appearance to the guns he later saw being held by petitioner and

16.

Guzman. He said, "cuete," which he described as Spanish slang for "gun." He acknowledged that he had not reported, at any time prior to trial, that he had seen a gun.

Chavez testified that, when he saw the gun, he hit the brakes and prepared to turn off the highway and as he did so, he heard a gunshot. He looked over and saw petitioner shooting a gun in the air. Chavez said, "What the fuck?" and "What the hell are you doing, homes?" Chavez testified that he heard more gunshots and looked behind him and saw Guzman shooting a gun. Chavez later testified that he did not see Guzman shooting, but only saw him bringing his hand back into the car. He acknowledged that he told detectives, "And [Guzman] did it, too. He just pulled out and he, like, shot, like, I think five of 'em." He did not know beforehand that petitioner and Guzman had guns.

Chavez then turned onto Linda Vista and went back to petitioner's house. He pulled into the carport and petitioner and Guzman got out to open the gate. Chavez pulled his car behind the gate and covered the hood with a cloth so police would not see it if they came by. Chavez saw Guzman hand petitioner what appeared to be a gun. Chavez told them to get rid of the guns. Chavez searched the back seat for shell casings because Guzman told him casings may have gone back there, but Chavez did not find any.

Chavez testified that he asked them why this had happened. Guzman said he did not mean to shoot anybody and was not trying to hit anybody. Guzman said he shot because he thought he was going to get shot. Petitioner and Guzman both stated they thought the occupants of the other vehicle had a gun. Chavez told Big Alex he thought they were only going to fight the people in the Neon.

Guzman also testified in the defense case.

Guzman testified that he had been at petitioner's house for two days prior to the shooting and had not seen any guns. When the group returned from buying beer in Plainview, he asked why the police were there but "[he] wasn't told nothing." He denied that Chavez mentioned any confrontation with the Neon when he returned from cruising.

17.

He denied the group planned to look for the Neon. When he eventually went out cruising with Chavez and petitioner, he did not get into the car with a gun and did not see anyone else bring a gun. While they were cruising, Chavez did not point out any vehicles or mention any problems with people in another car. Eventually, they followed the Neon onto the freeway. Guzman did not know why. They pulled up beside the Neon on the highway and Guzman saw what he thought was a gun sticking out of the back left passenger area of the Neon, pointing at them. Chavez said, "cuete," meaning "[g]un." Guzman heard some gunshots. He found a gun in the area between the front seats and picked it up and fired it, without aiming or intending to hurt anyone. He did not remember what he did with the gun he used.

## PROCEDURAL HISTORY

Petitioner, Guzman, and Chavez (collectively, the defendants) were charged in count 1 with the murder of Marlene in violation of section 187, subdivision (a). It was alleged that the murder was intentional and perpetrated by discharging a firearm from a motor vehicle with the intent to inflict death within the meaning of section 190.2, subdivision (a)(21). Counts 2, 3, 4, and 5 charged the defendants with the premeditated and deliberate attempted murders of Ray, Shalisa, Celeste, and Joseph in violation of sections 664 and 187. The defendants were charged in count 6 with discharging a firearm at a motor vehicle in violation of section 246. In count 7, Chavez was charged with permitting the discharge of a firearm from his vehicle in violation of former section 12034, subdivision (b).

With respect to counts 1 through 5, it was alleged that petitioner and Guzman personally used a firearm within the meaning of section 12022.5, former subdivision (a)(1), and that they discharged a firearm from a motor vehicle causing great bodily injury within the meaning of section 12022.5, former subdivision (b)(1). As to these counts, it was alleged as to Chavez that a principal was armed with a firearm within the

18.

meaning of section 12022, subdivision (a)(1).[13]  With respect to count 2, Guzman was alleged to have personally inflicted great bodily injury upon Ray within the meaning of section 12022.7.  Finally, as to count 3, it was alleged that petitioner personally inflicted great bodily injury upon Shalisa within the meaning of section 12022.7.

The defendants were tried together and, on July 23, 1999, a jury returned guilty verdicts on all counts and found all special allegations to be true.  Petitioner received a sentence of life without the possibility of parole on count 1, plus 10 years for the firearm use enhancement.  On each of counts 2, 3, 4, and 5, he received consecutive sentences of life with the possibility of parole, plus 10 years for each firearm use enhancement.  Additionally, he received a sentence of three years for the great bodily injury enhancement to count 3.  Sentence on count 6 was imposed and stayed pursuant to section 654.

On April 17, 2023, petitioner filed a petition for resentencing pursuant to section 1172.6.[14]  Counsel was appointed to represent him.  The People opposed the petition, arguing petitioner was ineligible for resentencing as a matter of law.  The court determined petitioner had made a prima facie case for resentencing and set the matter for an evidentiary hearing.

Although not a subject of the instant appeal, it appears Guzman also filed a petition for resentencing pursuant to section 1172.6, which proceeded to evidentiary hearing simultaneously with petitioner's petition.

The People filed a request for judicial notice of the trial transcripts for use at the evidentiary hearing.  In briefing submitted prior to the evidentiary hearing, the People argued the evidence showed petitioner and Guzman acted with the intent to kill.  The

---

[13] As to count 2, the information associated this enhancement with "Marcos Guzman."  (Some capitalization omitted.)  This appears to be a typographical error.

[14] It appears petitioner previously sought resentencing on his murder conviction pursuant to former section 1170.95 (now § 1172.6), and his request was denied.

People also argued the defendants created a "kill zone" and intended to kill everyone in the victim's car. This argument relied on the combined conduct of Guzman and petitioner to argue they intended to create a zone of fatal harm. The People also submitted lengthy briefing summarizing the trial testimony they intended to rely on at the hearing, which included D.T.'s report of inculpatory statements made by Guzman while in custody after the shooting.

In petitioner's trial brief, he argued Guzman's out-of-court statements were inadmissible against petitioner on hearsay grounds. Petitioner further argued the People could not meet their burden to prove that he had the specific intent to kill each occupant of the vehicle. Petitioner additionally argued the "kill zone" theory was inapplicable to him because the evidence showed he had fired only a single bullet.

The matter was heard on October 24, 2023. At the outset of the hearing, the court stated it had "read and considered the trial transcripts completely." The parties offered no further evidence. The People argued the evidence showed petitioner fired more than one shot. The People relied on Guzman's statements to D.T. to argue intent to kill and a kill zone theory of liability. Petitioner argued the evidence showed he fired only a single shot and that he could be held accountable only for his own behavior and not that of his codefendants. He contended there was no evidence of a plan to kill the people in the car. He further argued that the bullets entered the victim's vehicle below the windows, which he characterized as an area unlikely to cause death, thus suggesting none of the defendants had an intent to kill.

The court addressed and denied petitioner's and Guzman's petitions simultaneously as follows:

> "The evidence is clear on multiple fronts that before the shooting, the victims had a hostile encounter and confrontation with Big Alex and Co-defendant Chavez. After that encounter, the evidence is clear that Big Alex and Co-defendant Chavez went back to [petitioner's] house. The Co-defendant Chavez testified and acknowledged telling police the defendants,

[petitioner] and Guzman, left [petitioner's] house with Chavez to look for the victim's Neon.

"Later, while the victims were driving on Highway 65 at 55 to 60 miles per hour, the defendants, in their beige car, pulled up beside the victims, essentially bumper-to-bumper. The dark car being driven by Big Alex was directly behind the victim's car.

"Within seconds of the defendants pulling up to the victim's vehicle, the defendant's [*sic*] began shooting. The victim driver, [Joseph], heard more than ten shots.

"Criminalist O'Clair said four bullets hit the victim's car, and at least three others missed the car all together.

"[Joseph] said he saw muzzle flashes from two guns.

"Celeste said sparks were coming from the front and back seat windows where the defendants were sitting.

"Ray [P.] also saw flashes from the right front and rear passengers.

"The homicide victim was shot in the head, and the other two were shot in the back and the arm.

"The bullet holes were located in the trunk and door area of the victim vehicle. There were shell casings and a le[a]d core found at the scene.

"Defendant Guzman told inmate [D.T.] that they meant to shoot some guys. Guzman conceded he fired the gun out of the car.

"In this case, I do find that each defendant had the specific intent to kill the victims in the Neon. They armed themselves after a hostile encounter. They left [petitioner's] house to look for the victims.

"The defendants followed the victims accompanied by Big Alex. Defendant's [*sic*] car pulled very close to the victims, and immediately the defendants began shooting multiple times.

"This is supported by the testimony of Ray, Celeste, and Joseph [A.] who saw sparks and flashes coming from both guns.

21.

"Contrary to Guzman's testimony and both defendants' arguments here, the Court specifically finds no evidence that the victims were armed or that anyone displayed a firearm at the defendants.

"Based on the facts, each defendant specifically intended to kill each person in the victim's car beyond a reasonable doubt. Each defendant acted willfully, deliberately, and with premeditation to kill each of the victims. Thus, the defendants are guilty of Counts 2, 3, 4, and 5.

"As to Count 1, each defendant committed malice murder, willfully, deliberately, and with premeditation as to the homicide victim Marlene Romero. Moreover, each defendant is guilty of first degree murder of Marlene Romero by discharging a firearm from a motor vehicle and intentionally shooting a person outside the vehicle and intending to kill that person.

"The Court specifically disagrees with [petitioner's] contention that he fired the gun only one time based on the testimony of the three witnesses who saw flashes and sparks coming from both passenger windows. At least one of [petitioner's] bullets did hit the victim's vehicle, and the testimony of O'Clair was that there were bullets that missed the car.

"I also disagree that there was no intent to kill because the bullet holes were located below the passenger windows of the victim's vehicle.

"As to Guzman's contentions concerning [*People v. Banks* (2015) 61 Cal.4th 788 and *People v. Clark* (2016) 63 Cal.4th 522], the prosecutor is correct. Neither attempted murder charges in this case, nor the murder charges are based on concepts of felony murder. Here, Guzman and [petitioner] are guilty of malice murder and attempted malice murder with willfulness, premeditation, and deliberation.

"Additionally, each are guilty of first degree murder by discharging a gun from the motor vehicle, intentionally shooting at another, and intending to kill.

"The Court has also considered Guzman's argument concerning each defendant's youth in regard to their ability to formulate the specific intent required for these charges. There is recent appellate authority that specifically directs the Court to consider defendant's mental and emotional development in forming the necessary mental state because of their youth.

"I do find that the circumstances of these offenses are such that despite each defendant's youth, each deliberately chose to carry out an

22.

intent to kill the victims, and succeeded in killing one and injuring three others.

"I specifically find that defendants' youth did not interfere or affect their clear intent to kill these victims.

"Therefore, I deny the defendants', each of them, as to their petitions for resentencing, and the Court reaffirms the convictions found by the jury several years ago."

## DISCUSSION

### I.      Section 1172.6 Procedure

Effective January 1, 2019, Senate Bill No. 1437 (2017–2018 Reg. Sess.) (Senate Bill No. 1437) "altered the substantive law of murder in two areas." (*People v. Curiel* (2023) 15 Cal.5th 433, 448 (*Curiel*).) First, the bill narrowed the scope of the felony-murder rule "so that a 'participant in the perpetration or attempted perpetration of a [specified felony] in which a death occurs' can be liable for murder only if '[t]he person was the actual killer'; '[t]he person was not the actual killer, but, with the intent to kill, aided, abetted, counseled, commanded, induced, solicited, requested, or assisted the actual killer in the commission of murder in the first degree'; or '[t]he person was a major participant in the underlying felony and acted with reckless indifference to human life.' " (*People v. Arellano* (2024) 16 Cal.5th 457, 467–468, quoting § 189, subd. (e)(1)–(3).) Second, the bill "eliminate[d] liability for murder as an aider and abettor under the natural and probable consequences doctrine" by requiring that, "except in cases of felony murder, 'a principal in a crime shall act with malice aforethought' to be convicted of murder." (*Curiel*, at p. 449, quoting § 188, subd. (a)(3).) Now, " '[m]alice shall not be imputed to a person based solely on his or her participation in a crime.' " (*Curiel*, at p. 449.)

Additionally, Senate Bill No. 1437 added former section 1170.95, now section 1172.6, to provide a procedure for those convicted of a qualifying offense " 'to seek relief' where the two substantive changes described above affect a defendant's

23.

conviction." (*Curiel*, *supra*, 15 Cal.5th at p. 449.) Subsequently, Senate Bill No. 775 (2021–2022 Reg. Sess.) expanded the scope of these ameliorative provisions to "[c]larif[y] that persons who were convicted of attempted murder or manslaughter" are permitted the same relief as those convicted of murder. (Stats. 2021, ch. 551, § 1, subd. (a); accord, *People v. Arellano*, *supra*, 16 Cal.5th at p. 468, fn. 3.)

Under section 1172.6, an offender seeking resentencing must first file a petition in the sentencing court, and the sentencing court must determine whether the petitioner has made a prima facie showing that he or she is entitled to relief. (§ 1172.6, subds. (a)–(c); accord, *People v. Strong* (2022) 13 Cal.5th 698, 708.) If the sentencing court determines the petitioner has made a prima facie showing, the court must issue an order to show cause and hold a hearing to determine whether to vacate the murder and/or attempted murder convictions. (§ 1172.6, subds. (c), (d)(1).)

At this evidentiary hearing, "the burden of proof shall be on the prosecution to prove, beyond a reasonable doubt, that the petitioner is guilty of murder or attempted murder under California law as amended by the changes to Section 188 or 189 made effective January 1, 2019." (§ 1172.6, subd. (d)(3).) "The admission of evidence in the hearing shall be governed by the Evidence Code, except that the court may consider evidence previously admitted at any prior hearing or trial that is admissible under current law, including witness testimony, stipulated evidence, and matters judicially noticed. The court may also consider the procedural history of the case recited in any prior appellate opinion." (§ 1172.6, subd. (d)(3).)

"Ordinarily, a trial court's denial of a section 1172.6 petition [following an evidentiary hearing] is reviewed for substantial evidence. [Citation.] Under this standard, we review the record ' " 'in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the

24.

defendant guilty beyond a reasonable doubt.' " ' " (*People v. Reyes* (2023) 14 Cal.5th 981, 988 (*Reyes*).)

## II. Substantial Evidence Supports Multiple Counts of Attempted Murder

Petitioner contends substantial evidence does not support his convictions on multiple counts of attempted murder because the evidence suggests that he fired only a single shot into a car occupied by multiple victims, and thus does not suggest he intended to kill all the victims. We conclude substantial evidence supports the convictions.

### A. Applicable Law Regarding Attempted Murder

"To prove the crime of attempted murder, the prosecution must establish 'the specific intent to kill and the commission of a direct but ineffectual act toward accomplishing the intended killing.' [Citation.] When a single act is charged as an attempt on the lives of two or more persons, the intent to kill element must be examined independently as to each alleged attempted murder victim; an intent to kill cannot be 'transferred' from one attempted murder victim to another under the transferred intent doctrine." (*People v. Canizales* (2019) 7 Cal.5th 591, 602 (*Canizales*).)

A person may be convicted of attempted murder as a direct aider and abettor. " '[D]irect aiding and abetting is based on the combined actus reus of the participants and the aider and abettor's own mens rea.' " (*Reyes*, *supra*, 14 Cal.5th at pp. 990–991.) " '[T]o be guilty of attempted murder as an aider and abettor, a person must give aid or encouragement with knowledge of the direct perpetrator's intent to kill and with the purpose of facilitating the direct perpetrator's accomplishment of the intended killing— which means that the person guilty of attempted murder as an aider and abettor must intend to kill.' " (*People v. Nguyen* (2015) 61 Cal.4th 1015, 1054 (*Nguyen*).)

Intent to kill may "be inferred from the defendant's acts and the circumstances of the crime." (*People v. Smith* (2005) 37 Cal.4th 733, 741.) " 'Among the factors which may be considered in making the determination of aiding and abetting are: presence at

the scene of the crime, companionship, and conduct before and after the offense.' " (*Nguyen*, *supra*, 61 Cal.4th at p. 1054.)

Our Supreme Court also has recognized that "a shooter may be convicted of multiple counts of attempted murder on a 'kill zone' theory where the evidence establishes that the shooter used lethal force designed and intended to kill everyone in an area around the targeted victim (i.e., the 'kill zone') as the means of accomplishing the killing of that victim." (*People v. Smith*, *supra*, 37 Cal.4th at pp. 745–746.) The "kill zone" or "concurrent intent" theory applies only where "(1) the circumstances of the defendant's attack on a primary target, including the type and extent of force the defendant used, are such that the only reasonable inference is that the defendant intended to create a zone of fatal harm—that is, an area in which the defendant intended to kill everyone present to ensure the primary target's death—around the primary target and (2) the alleged attempted murder victim who was not the primary target was located within that zone of harm. Taken together, such evidence will support a finding that the defendant harbored the requisite specific intent to kill both the primary target and everyone within the zone of fatal harm." (*Canizales*, *supra*, 7 Cal.5th at p. 607.)

## B. Analysis

The trial court found petitioner and Guzman specifically intended to kill each of the victims. Prior to doing so, the trial court made several factual findings in support of this ultimate finding. In relevant part, the trial court found the following. After a hostile encounter between Chavez and Big Alex on one side, and the victims on the other, the defendants armed themselves and went out to look for the victims. They followed the victims onto the highway, pulled close to them, and immediately fired at them multiple times. Shots were fired from both the front and back windows of the perpetrators' car. At least four bullets hit the victims' car and at least three missed the car. Subsequently, Guzman told D.T. that they meant to shoot some guys. With the exception of the court's reliance on Guzman's statements to D.T., petitioner does not dispute these factual

26.

findings.[15] Taken together, and viewed in the light most favorable to the trial court's ruling (*Reyes*, *supra*, 14 Cal.5th at p. 988; *People v. Hill* (2024) 100 Cal.App.5th 1055, 1066), these findings are sufficient to support the trial court's ultimate finding that petitioner and his companions sought out the victims and shot at them with the intent to kill.

Nonetheless, petitioner contends the evidence does not support a finding that he intended to kill each of the victims because the evidence suggests he fired only a single shot from a nine-millimeter firearm, while the remaining shots were fired by Guzman. We reject this argument on two grounds. First, even if petitioner fired only a single shot, the evidence, viewed in the light most favorable to the superior court's ruling, supports a finding that petitioner aided and abetted Guzman in the attempted killings, with the knowledge that Guzman intended to shoot and kill the victims and the intent to facilitate that conduct, and while harboring his own intent to kill.[16] Again, petitioner's companions engaged in a hostile encounter with the victims, one of whom had a prior romantic encounter with petitioner, earlier in the evening. Petitioner's companions returned to petitioner's house, where this encounter was discussed. The group formed a plan to find the victim's vehicle in order to seek retribution under circumstances where they would not be outnumbered. They armed themselves with two firearms and pursued the victims' vehicle onto the highway. Petitioner fired upon the victims' vehicle when he was side-by-side with the left rear passenger area of the victims' car. Indeed, the

---

[15] Petitioner argues testimony regarding Guzman's statements to D.T. constitutes inadmissible hearsay, an argument we address and reject below.

[16] The trial court addressed petitioner's and Guzman's resentencing petitions simultaneously and did not differentiate between them as to theories of liability. As such, the trial court did not specifically state the theory on which it found petitioner was guilty of multiple counts of attempted murder, i.e., as a direct perpetrator or aider and abettor. However, on substantial evidence review, "[r]eversal is not warranted 'unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction]." ' " (*People v. Thomas* (2023) 14 Cal.5th 327, 378.)

evidence suggests petitioner was the first to begin shooting. The perpetrators then returned to petitioner's house, where petitioner assisted in concealing the suspect vehicle. Petitioner also was the last person described as handling the weapons at his house, suggesting he was responsible for disposing of them.

The foregoing is evidence of a jointly planned shooting, one in which the court had strong reason to conclude petitioner intended to aid and abet Guzman in attempting to kill the victims who petitioner did not personally shoot. Petitioner's presence at the scene, his participation in a plan to seek out and shoot the victims, his own discharge of a firearm, his continued companionship with the coparticipants after the offense, and his efforts to conceal their conduct, constitute substantial evidence in support of his convictions for attempted murder under a direct aiding and abetting theory of liability.

Second, the trial court specifically rejected petitioner's contention that he fired only once, based on testimony that the victims saw flashes and sparks coming from both the front and rear right passenger windows. Joseph testified that he saw flashes from guns coming from both windows and heard more than 10 shots. Celeste testified that she saw one or two sparks coming from the area of the passenger windows before she turned away, then heard additional pops. Ray saw a gun coming from the front passenger seat area and saw flashes coming straight from that gun toward their car, and he heard more than five shots. None of this testimony supports petitioner's contention that he fired only a single shot.

Nor is the physical evidence conclusive on this point. Eight shell casings were recovered in relation to the shooting: seven .38-caliber casings at the scene and one nine-millimeter casing in the Civic. However, only four bullets and one spent lead core were recovered: one .38-caliber bullet at the hospital, two .38-caliber bullets and one nine-millimeter bullet in the victim's car, and one lead core found at the scene that could have come from a .38-caliber or nine-millimeter bullet. This evidence suggests some physical evidence relating to the gunfire was not recovered. Moreover, Chavez searched the Civic

28.

for shell casings and, although he stated he did not find any, the court, as trier of fact, was free to disregard this assertion. When viewed in the light most favorable to the superior court's ruling (*Reyes*, *supra*, 14 Cal.5th at p. 988; *People v. Hill*, *supra*, 100 Cal.App.5th at p. 1066), the foregoing evidence supports the court's finding that petitioner fired more than once.

Petitioner also argues that his multiple convictions for attempted murder cannot be sustained under a kill zone theory of liability. Although the People argued for petitioner's liability under a kill zone theory, the trial court's ruling does not reflect that it relied on such theory in finding petitioner guilty of multiple counts of attempted murder. Rather, the trial court relied primarily on petitioner's pre-shooting conduct to find that these were jointly-planned attempted killings.

Regardless, " '[w]e presume that the court properly applied the law . . . unless the appellant affirmatively shows otherwise.' " (*People v. Mataele* (2022) 13 Cal.5th 372, 414.) Under the law in effect at the time of the trial court's ruling, it could apply the kill zone theory only where the circumstances of the attack on a primary target are such that "the only reasonable inference is that the defendant intended to create a zone of fatal harm," and the alleged attempted murder victims were in that zone of fatal harm. (*Canizales*, *supra*, 7 Cal.5th at p. 607.)[17] Here, Guzman's firing of at least seven shots toward an adjacent vehicle from relatively close range constitutes substantial evidence that he intended to create a zone of fatal harm in the area in which the attempted murder victims were located. Furthermore, substantial evidence suggests the defendants had as their primary target either Joseph or Shalisa or both, given their involvement in the prior altercation. And, as stated above, substantial evidence supports a finding that petitioner

_____

[17] Petitioner contends *Canizales* applies retroactively to his case. However, *Canizales* was decided prior to the trial court's ruling and was therefore the law in effect at the time. We have no cause to apply retroactivity principles in this circumstance, and the applicability of current law is undisputed.

knew of Guzman's intent to kill all victims in the zone of harm, intended to facilitate and did facilitate that result, and did so while harboring his own intent to kill.[18] Assuming the court relied on a kill zone theory to find petitioner guilty, petitioner has not shown affirmative error.

In sum, substantial evidence supports the trial court's finding that petitioner had the specific intent to kill each of the attempted murder victims.

## III. Hearsay Evidence

Petitioner contends the court erred in relying on D.T.'s testimony regarding statements Guzman made while in custody after the shooting. Petitioner contends this testimony was admissible as to Guzman, but constituted inadmissible hearsay as to petitioner. We conclude the testimony was admissible against petitioner and the court did not err in considering it.[19]

### A. Additional Background

D.T. testified that he spoke with Guzman while in custody in a juvenile facility in January 1998. According to D.T., Guzman stated that he was in custody for a drive-by shooting and that they did not mean to shoot the girl. D.T. reported to law enforcement that Guzman told him "they meant to shoot some guys and the girl was in the cross fire, something like that. She was just in the way."

---

[18] Petitioner relies on *People v. Perez* (2010) 50 Cal.4th 222, 225, for the proposition that a defendant's firing of a single shot without the intent to target any particular individual cannot support liability under a kill zone theory. Unlike *Perez*, the instant case does not involve a single defendant firing a single shot, but multiple defendants who collectively fired multiple shots. *Perez* is inapposite.

[19] Although petitioner objected to the court's consideration of this testimony, the People contend he forfeited this issue on appeal by failing to press the court for a ruling on this objection during the evidentiary hearing. Petitioner contends any such forfeiture constituted ineffective assistance of counsel. We address and reject the claim on the merits.

Originally, this testimony was admitted only as to Guzman.[20]  However, after Guzman and Chavez chose to testify, the parties acknowledged that concerns relating to the admissibility of their out-of-court statements were eliminated.  During the settling of jury instructions, the parties discussed the need for a limiting instruction regarding various out-of-court statements made by the defendants.  The court suggested fashioning an instruction to inform the jury that (1) out-of-court statements made by petitioner (who did not testify at trial) were admissible only as to petitioner, and (2) the court's prior admonition regarding the limited use of out-of-court statements made by Chavez and Guzman was no longer in effect.  Ultimately, the request for a limiting instruction was withdrawn by the defense.[21]

The jury was instructed:

> "Evidence has been received of a statement made by a defendant after his arrest.  At the time the evidence of this statement was received, you were instructed they could not be considered by you against the other defendants.  That instruction no longer applies, and such statement may be considered by you against the other defendants."

On the petition for resentencing, the trial court referred to Guzman's statements to D.T. in its summary of facts supporting its determination that both petitioner and Guzman intended to kill each person in the victim's car.

### B.     Applicable Hearsay Law

" 'Hearsay evidence' is evidence of a statement that was made other than by a witness while testifying at the hearing and that is offered to prove the truth of the matter

---

[20] This was not the only testimony subject to such limitation.  Throughout trial, the admissibility of certain out-of-court statements was limited to the defendant making the statement.

[21] However, the jury received a general limiting instruction advising it that certain evidence was admitted for a limited purpose and could only be considered for that purpose.

31.

stated." (Evid. Code, § 1200, subd. (a).) Except as otherwise provided, hearsay evidence is inadmissible. (*Id.*, subd. (b).)

"Evidence of a statement is not made inadmissible by the hearsay rule when offered against the declarant in an action to which he is a party . . . ." (Evid. Code, § 1220.) In a criminal action, however, this exception to the hearsay rule is subject to certain constitutional limitations. (*Id.*, § 1204 ["A statement that is otherwise admissible as hearsay evidence is inadmissible against the defendant in a criminal action if the statement was made, either by the defendant or by another, under such circumstances that it is inadmissible against the defendant under the Constitution of the United States or the State of California."].)

Relevant here, the Sixth Amendment to the United States Constitution protects a defendant's right to confront and cross-examine witnesses and generally prohibits the admission of testimonial hearsay absent certain procedural protections. (*Pointer v. Texas* (1965) 380 U.S. 400; *People v. Holmes, McClain and Newborn* (2022) 12 Cal.5th 719, 748; *People v. Sanchez* (2016) 63 Cal.4th 665, 670.) In a joint trial, the Sixth Amendment generally prohibits the admission of a nontestifying codefendant's confession implicating another defendant. (*Bruton v. United States* (1968) 391 U.S. 123, 127–128; *Holmes, McClain and Newborn*, at p. 749; *People v. Aranda* (1965) 63 Cal.2d 518, 530–531.) However, these concerns are eliminated when the codefendant who made the out-of-court statement appears for cross-examination at trial. (*Nelson v. O'Neil* (1971) 402 U.S. 622, 627; *People v. Boyd* (1990) 222 Cal.App.3d 541, 562–563; see *Crawford v. Washington* (2004) 541 U.S. 36, 59; see also *People v. Richardson* (2008) 43 Cal.4th 959, 1007.)

### C.     Admission of Evidence at the Evidentiary Hearing

"The admission of evidence in the [section 1172.6 evidentiary] hearing shall be governed by the Evidence Code, *except that the court may consider evidence previously admitted at any prior hearing or trial that is admissible under current law*, including

witness testimony, stipulated evidence, and matters judicially noticed. The court may also consider the procedural history of the case recited in any prior appellate opinion. However, hearsay evidence that was admitted in a preliminary hearing pursuant to subdivision (b) of Section 872 shall be excluded from the hearing as hearsay, unless the evidence is admissible pursuant to another exception to the hearsay rule." (§ 1172.6, subd. (d)(3), italics added.)

"In effect, what section 1172.6, subdivision (d)(3) does is create a new hearsay exception applicable specifically to merits hearings in section 1172.6 resentencing proceedings." (*People v. Davenport* (2023) 95 Cal.App.5th 1150, 1158.) The phrase "admissible under current law" (§ 1172.6, subd. (d)(3)) means "that the basis for admission of testimony at the hearing or trial in which it was previously admitted must remain a valid basis for admitting the testimony 'under current law' " (*Davenport*, at p. 1158, italics omitted).

### D.    Analysis

D.T.'s testimony regarding Guzman's statements was admissible against petitioner at petitioner's trial. Guzman testified at trial and was subject to cross-examination by petitioner's counsel. As such, the Sixth Amendment presented no bar to the admission of D.T.'s testimony.[22] Guzman was questioned regarding his prior statements to D.T. and denied knowing him or having any recollection of previously speaking with him. He also denied telling D.T. that he meant to shoot some guys and a girl got in the crossfire. In this context, D.T.'s testimony regarding Guzman's prior statements was admissible as a prior inconsistent statement pursuant to Evidence Code section 1235.

---

[22] The People contend the Sixth Amendment did not apply because the statements were nontestimonial. We do not resolve this question because, even if we assume the statements were testimonial, Guzman's availability for cross-examination eliminated any Sixth Amendment concerns.

Petitioner does not cite, and we do not find, any changes in the law since his trial that would affect the admissibility of Guzman's out-of-court statements. If the trial were to take place today, the statements could be admitted on the same grounds they were admitted in the original trial. Accordingly, the statements were "admissible under current law" for purposes of section 1172.6, subdivision (d)(3), and the court properly considered them in disposing of petitioner's section 1172.6 petition for resentencing.

## DISPOSITION

The order denying the petition for resentencing is affirmed.

DETJEN, J.

WE CONCUR:

LEVY, Acting P. J.

MEEHAN, J.